AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT



for the

Central District of California

United States of America

v.

Donovan Pham Nguyen,

Defendant(s)

LODGED
CLERK, U.S. DISTRICT COURT

08/19/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ LM _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

AUG 19 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DTS _____ DEPUTY

Case No.    ED20MJ-00432

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about June 1, 2020, in the County of Riverside in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 912 | False Impersonation of a Federal Officer or Employee |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ signed pursuant to Fed. R. Crim. P. 4.1
_____
*Complainant's signature*

Alnahl Jones, Special Agent (HSI)
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    August 19, 2020
_____

_____
*Judge's signature*

City and state:   Riverside, California
_____

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Alnahl Jones, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Donovan Pham NGUYEN for a violation of 18 U.S.C. § 912 (False Impersonation of a Federal Officer or Employee)[1] on June 1, 2020.

2.    This affidavit is also made in support of an application for warrants to search the following locations, which are described more fully in Attachments A-1 through A-3 (collectively the "SUBJECT PREMISES"), the following vehicle described more fully in Attachment A-4, and the person of NGUYEN described more fully in Attachment A-5:

        a.    544 South Marigold Lane, Orange, California ("SUBJECT PREMISES 1");

        b.    20829 Golden Rain Road, Riverside, California ("SUBJECT PREMISES 2");

        c.    NGUYEN's business office located inside 23081 Via Campo Verde, Suite E, Laguna Woods, California ("SUBJECT PREMISES 3"); and

---

[1] That statute provides: "Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both."

1

d.    a gray 2018 Toyota Tacoma, bearing California license plate 75600N2 and vehicle identification number 3TMAZ5CN2JM076462 (the "SUBJECT VEHICLE").

3.    The items to be seized are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 912 (False Impersonation of a Federal Officer or Employee); 18 U.S.C. § 1017 (Government Seals Wrongfully Used); 18 U.S.C. § 1001 (Fraud and False Statements); 18 U.S.C. § 1343 (Wire Fraud); and 18 U.S.C. § 499 (Manufacture of Counterfeit United States Official Pass or Permit) as described in Attachment B. Attachments A-1 through A-4 and B are incorporated herein by reference.

4.    Any facts or circumstances that are cited in this affidavit are familiar to me through my direct participation in this investigation, discussions with other law enforcement personnel involved in this investigation, or my review of investigative reports generated by other law enforcement personnel.  This affidavit is made for the sole purpose of demonstrating probable cause for the issuance of the requested complaint and search warrant and does not purport to set forth all my knowledge of our investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent ("SA") of the Department of Homeland Security, Homeland Security Investigations ("HSI"), and

2

have so been employed since October 2018.  I am assigned to the
HSI office located in San Bernardino, California.  I am
currently assigned to investigate fraud, human trafficking, and
related crimes in Riverside and San Bernardino Counties,
California.  I have received specialized training at the Federal
Law Enforcement Training Center in Glynco, Georgia.  Prior to
joining HSI, I served on active duty in the United States Navy
for twenty years.  During this time, I served as a Military
Police Chief Petty Officer and as a Criminal Investigator for
the Criminal Investigations Division, Commander Navy Region
Southwest.

        6.    I am assigned to the HSI office in San Bernardino,
California, tasked with investigating violations of federal laws
in the Central District of California.  I am a federal law
enforcement officer authorized to execute warrants issued under
the authority of the United States.  I currently investigate
fraud, identity theft, human trafficking, human smuggling and
related crimes in Riverside and San Bernardino Counties.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

        7.    Going back almost ten years, NGUYEN has pretended to
be an HSI SA, acted as such, and falsely used the title to
obtain things of value.  NGUYEN, however, does not work for, nor
has he ever worked for, HSI.  Instead, NGUYEN used to be a
privately contracted security guard at a DHS facility.  On top
of numerous witness accounts of NGUYEN lying to others about
being an HSI SA and wearing HSI tactical uniforms and other
clothing, my investigation has revealed incidents in which

3

NGUYEN participated in law enforcement actions, including participating in the execution of a federal search warrant, while acting under his false title.

8.    In June 2020, NGUYEN discussed a potential investigation with an Assistant Chief Investigator ("Assistant Chief") at the Riverside County District Attorney's Office ("RCDA") after an introduction from a mutual friend.  NGUYEN purported to be an HSI employee and informed the Assistant Chief that, after discussing the matter with NGUYEN's supervisor, HSI could not assist RCDA in the investigation.

9.    In spring 2019, while working for a private security company called Village Management Services ("VMS") at a retirement community in Laguna Woods, NGUYEN happened upon agents with the U.S. Department of State, Diplomatic Security Service ("DSS"), preparing to execute a warrant in the retirement community.  NGUYEN convinced the DSS agents that NGUYEN was an HSI SA, and NUGYEN participated in executing the warrant with DSS agents.

10.    Interviews also indicated that he used the title to obtain things of value.  He purchased firearms using a false DHS ID, which allowed him to avoid taking and paying for certain firearm safety courses required by the State of California.  He also used his purported duties as an HSI SA to excuse his frequent absence from work at VMS while still being paid.

11.    Official public records show that NGUYEN listed SUBJECT PREMISES 1 as his residence.  Agents have seen NGUYEN entering and exiting the home at that address during

4

surveillance.  I believe that NGUYEN lives at SUBJECT PREMISES 1.

12.  SUBJECT PREMISES 2 contains a home registered to NGUYEN's father.  NGUYEN listed this address as his residential address during the purchase of 42 firearms in the State of California from various firearms dealers, including the purchase of firearms where NGUYEN falsely represented himself as an HSI SA during the firearm sales to avoid completing certain safety training requirements.  NGUYEN also runs a private security company registered with the California Secretary of State at SUBJECT PREMISES 2.

13.  SUBJECT PREMISES 3 is NGUYEN's office at VMS.  VMS coworkers have reported seeing an HSI badge, DHS plaque, and various tactical gear, including a ballistic shield, inside of SUBJECT PREMISES 3.

## IV.  <u>STATEMENT OF PROBABLE CAUSE</u>

14.  This investigation is being conducted jointly with the DHS Immigration and Customs Enforcement ("ICE") Office of Professional Responsibility ("OPR"), Los Angeles.  Based on my review of investigative reports, my own investigation, and my discussions with other law enforcement officers working on this investigation, I learned the following information:

### A.  **HSI learns of NGUYEN's impersonation after a call from RCDA**

15.  In or around June 2020, RCDA employees contacted HSI's San Bernardino office about an HSI SA with whom RCDA had spoken about an investigation.  On July 2, 2020, after learning that no

such HSI SA had discussed the investigation with RCDA, HSI and OPR Los Angeles SAs interviewed RCDA Chief Investigator J.D. and Assistant Chief Investigator M.W. During the interview, we learned the following:

      a.    A.M., a gun-store owner in Riverside, contacted RCDA to report possible crimes. A.M. stated he had already spoken with a personal acquaintance, later identified as NGUYEN (whom A.M. believed to be an HSI SA), regarding a possible criminal case. A.M. asked RCDA to partner with HSI to jointly investigate. RCDA investigators made several attempts to contact NGUYEN and left voicemail messages using the phone numbers provided by A.M.

      b.    On June 1, 2020, RCDA Assistant Chief M.W. received a call from NGUYEN. During the call, NGUYEN stated he had discussed the possible criminal case with his supervisors and his agency was unwilling to take the case because a witness had been deported. During the call, NGUYEN made a statement to Weinstein that he "came over from the CBP [Customs and Border Protection] side" to HSI.

16. After the interview, HSI agents checked internal databases and saw that NGUYEN was not a current or former DHS employee. On July 1, 2020, HSI Assistant SA in Charge Robert Goetsch checked the ICE employee directory and did not find anyone employed by ICE named Donovan Pham NGUYEN. On July 2, 2020, OPR Senior SA ("SSA") David Guppenberger checked in the internal affairs case management system and found no record of Donovan Pham NGUYEN in the system. U.S. Office of Personnel

Management ("OPM") databases showed that NGUYEN was a former contractor with Paragon Systems, a private security company that contracts with DHS to provide security guard services at DHS federal facilities. Paragon employees are in no way considered federal employees of DHS. Further, as detailed below, later investigation showed that NGUYEN left the AMOC in 2015 after an internal investigation in 2014 showed that he was using machines at AMOC to print fake DHS IDs.

17. On July 1, 2020, HSI Investigative Research Specialist ("IRS") Jessica Howard searched social media and found NGUYEN's LinkedIn profile. I compared the profile photo and other information on the account with NGUYEN's photo and NGUYEN's personal information that I've learned in this investigation, and I believe the account belongs to NGUYEN.

a. In one image posted on NGUYEN's account, NGUYEN was posing in a suit and tie, wearing what appears to be an HSI badge lapel pin.



b.   NGUYEN had posted his current employment as "Department of Homeland Security Agent," indicating he has been employed from June 2008 to present, representing he has 12 years and 2 months of employment under the title "Agent."  This caption appears next to an image of the DHS seal in the job-experience section.

18.   IRS Howard also did records checks and found that NGUYEN was listed as the owner of a private security company called Vigilantz.[2]  Public searches showed that Vigilantz has a website at www.vigilantzsecurity.com, listing offices in Irvine and Riverside.  On the "Contact Us" section of the website, one of the three listed email addresses is dnguyen@vigilantzsecurity.com.  On the "About Us" section of the website, the company boasts that it "is a security company founded by a group of federal/state law enforcement agents and officers and private security officers located in the Inland Empire Counties of Southern California."

**B.   NGUYEN's time as a contractor at Paragon Systems**

19.   On July 27, 2020, I interviewed Joe Smith at the Murrieta Police Department.  The interview was audio recorded.  Following the interview, Smith provided a sworn, written affidavit that I witnessed with OPR SSA Guppenberger.  From that interview, I learned the following:

a.   Smith was the Senior Security Specialist at the U.S. Customs and Border Protection Air and Marine Operation

---

[2] I'm not sure if this is supposed to be a play on the word "vigilance" or "vigilantes."

Center ("AMOC") in Riverside, California.  Smith stated he met NGUYEN around 2011 while working at the AMOC.  NGUYEN worked as a site supervisor for Paragon Security at the AMOC.

       b.   In October 2014, Smith received a call from base security forces asking if AMOC had changed the format of their ID cards.  The security forces indicated they had seized a suspicious DHS ID card with a letter authorizing access to the base from a person attempting to enter the base.  Smith went to the front gate and verified that the IDs were not official.  Further, Smith indicated NGUYEN had generated the unauthorized, unofficial letter stating that NGUYEN was the authorizing security official.  NGUYEN later told Smith that NGUYEN only made two such IDs.

       c.   NGUYEN would have had access to the Physical Access Control System, also called the DSX, through his official duties at the AMOC.  NGUYEN's official duties included utilizing the DSX to create local access cards for employees and visitors.

       d.   Around December 5, 2014, Smith received a text message from Paragon Security Officer Caro containing a photo of NGUYEN.  The photo showed NGUYEN in civilian clothing with a firearm and official looking CBP belt badge prominently displayed on his hip. Smith indicated he showed the photos to his direct supervisor, James Durrett and Operations Director Keith Jones.



e.    NUGUYEN's printing false IDs triggered an internal investigation into his misconduct.  NGUYEN left AMOC in 2015.

20.  Smith gave me a copy of the unauthorized letter NGUYEN had drafted, and I verified that Smith had described its contents accurately.

21.  I showed Smith photocopies of three purported DHS ID cards.  One card bore the name Richard Castro and the other Gerald Burnett.  Smith recognized both individuals as current employees of Paragon Security working at the AMOC.  The other card bore NGUYEN's name and photo.  Smith indicated the ID cards were not authorized, utilized, or generated by the AMOC.[3]

**C.    NGUYEN's use of a fake DHS ID when purchasing firearms**

22.  On July 2, 2020, I interviewed A.M. at his residence located in Riverside, California.  A.M. is the owner of a gun store and a registered Federal Firearms Licensee ("FFL").  In the interview, I learned the following:

a.    A.M. has known NGUYEN for approximately six or seven years after a mutual friend, V.M., introduced them so NGUYEN could purchase a firearm.  A.M. knew NGUYEN as a DHS agent because NGUYEN introduced himself as an agent with DHS and provided DHS credentials during his first firearms purchase. Since that time, NGUYEN purchased six or seven firearms from A.M.  NGUYEN had introduced two other people as DHS agents,

---

[3] The photocopied ID cards that I showed Smith are discussed below.  They were the same cards NGUYEN presented to A.M. to purchase firearms and the same cards that Castro and Burnett presented to A.M. after NGUYEN introduced them.

11

Castro and Burnett, who also presented DHS credentials while purchasing firearms. Presenting law enforcement credentials allows a firearm purchaser to avoid certain firearm-safety classes that the State of California requires for the general public before such a purchase.

b. NGUYEN asked to purchase an assault rifle in 2015 or 2016; A.M. informed NGUYEN the only way he could purchase the rifle was with an official letter from his agency. A.M. stated NGUYEN never provided a letter, so A.M. never sold him the rifle.

c. A.M. recalled a fund-raising event he held in 2017 for previous Riverside County Sheriff Stan Sniff, with approximately 300 Riverside County sheriff's deputies and other law enforcement officials in attendance. NGUYEN attended and introduced himself to others as an agent with HSI.

d. Several months ago, A.M. advised NGUYEN of a possible criminal case and asked NGUYEN to contact him so he could pass along information. A.M. never gave NGUYEN any tangible information because NGUYEN "ghosted" him and would not return any of his phone calls. NGUYEN would respond sporadically via text message and state that he was too busy to respond. One text included a photo of what appeared to be a tactical police or SWAT unit standing around an assault vehicle, along with NGUYEN's message: "I'm busy." A.M. grew tired of NGUYEN not responding and decided to contact RCDA for assistance.

e.    During the course of their acquaintance, NGUYEN gifted A.M. HSI merchandise, including an HSI mug and an HSI duffle bag.

23.   After the interview, A.M. gave me the Dealer Record of Sales ("DROS") forms for all firearms A.M. sold to NGUYEN.  I reviewed each of the DROS forms and found seven firearm sales containing a copy of a fake DHS ID card bearing NGUYEN's name and photo inside a leather DHS credential holder.  A.M. informed me that NGUYEN presented the fake I.D. card inside the credential holder in person for the first two transactions. A.M. said there were three later transactions where NGUYEN presented only the fake I.D. card in person.  During the other transactions, A.M. informed me that he simply asked NGUYEN whether any of his information had changed and, after NGUYEN replied that it had not, A.M. used photocopies of NGUYEN's ID from previous transactions.



###### D.    NGUYEN's current work at VMS

######    1.    Interviews with NGUYEN's VMS co-workers

######        a.    *Carlos Rojas, VMS Security Director*

24.    On July 28, 2020, I interviewed Carlos Rojas at the Orange Police Department.  The interview was audio recorded.  Following the interview, Rojas provided a sworn, written affidavit that I witnessed with OPR SSA Guppenberger.  In the interview, I learned the following:

   a.    Rojas began working as the Security Director for VMS near the end of February 2020.  VMS supplies security services for Laguna Woods Village, a senior living community in Laguna Woods, California.  Rojas began working at VMS after he retired as the Chief of the Santa Ana Police Department.

   b.    NGUYEN currently works at VMS as a "Supervisor 1" and had worked with VMS for a number of years before Rojas became Security Director.  Rojas first met NGUYEN while conducting meet-and-greets with VMS employees.  During Rojas's initial meeting with NGUYEN, NGUYEN stated he owned several businesses, including a security company, a property management company, and an ice cream shop.  NGUYEN also stated that he was a special agent with HSI.  NGUYEN told Rojas he was a GS-14 1811[4]

---

[4] I know from my own experience working in the federal government that "GS-14" refers to a particular level on the general federal pay scale and that "1811" refers to the federal criminal investigator classification series established by the OPM.  SAs with the various federal law enforcement agencies are colloquially called "1811s" because they fall under that classification series.  Other than SAs, the 1811 series includes titles like Deputy U.S. Marshal with the U.S. Marshals Service and Postal Inspector with the U.S. Postal Inspection Service.

and that he investigated sex trafficking and human trafficking
out of the Santa Ana HSI office.[5]

     c.   On one occasion, Rojas saw NGUYEN wearing a long-
sleeve pullover t-shirt that said "Homeland Security
Investigations Special Agent" and had an HSI badge on the front.
On another occasion, NGUYEN gave Rojas a pullover and stated it
was from HSI.  NGUYEN said HSI allotted him a number of
merchandise points each year[6] and that NGUYEN purchased the
pullover with points.

     d.   Rojas spoke to several employees at VMS who
believed NGUYEN was a special agent with HSI.  VMS Operations
Manager Tom Siviglia told Rojas that he had seen NGUYEN with an
ID and badge.  Siviglia further stated NGUYEN had worn "special
agent" gear to work, including a gun, drop down holster,
tactical vest, and badge.  Rojas had seen the same thing, and
Rojas gave me photographs like the one below, dated January 31,
2019, showing NGUYEN in the VMS office wearing tactical gear
bearing an HSI patch:

---

All of these titles are sworn federal law enforcement officers,
and a privately contracted security guard at a federal facility,
the job that NGUYEN formerly held, is unequivocally not an 1811.

   [5] I have not asked anyone at HSI Santa Ana about NGUYEN
because I believe NGUYEN may know one or more employees at that
office.  In addition to working for Paragon Systems at AMOC,
Smith thought that NGUYEN may have worked for Paragon Systems as
a security guard at the HSI Santa Ana office as well.  Though my
records checks have not yet confirmed that, I do not want to
risk tipping NGUYEN off about the investigation.

   [6] I know from my own experience with HSI that that's not
true.



      e.    Siviglia also told Rojas that NGUYEN had lights and sirens installed in his personal vehicle, a grey Toyota Tacoma (the SUBJECT VEHICLE).  Siviglia showed Rojas a video of NGUYEN's truck in which red and blue lights and sirens were activated.  Rojas gave SSA Guppenberger and me a copy of the video, from which I've included the following screen shot:

17



   f.   Over the years, Rojas had seen or heard about
NGUYEN "patting down" VMS employees, including Robert Martinez,
Danny Mayer, and Rick Yates.  NGUYEN said he was doing it
jokingly and that it was just "boys being boys."  Rojas also
learned NGUYEN had utilized the lights and sirens installed in
his personal vehicle to pull over Martinez.  Again, NGUYEN
implied he pulled Martinez over as a joke.

   g.   NGUYEN filed a complaint against VMS employee
Rick Yates after Yates told other VMS employees that NGUYEN was
not actually an HSI SA.  Based upon this complaint, VMS opened
an investigation utilizing an outside investigator.  The
investigator spoke to several VMS employees who believed NGUYEN
was a SA with HSI.  The investigator also directly asked NGUYEN
if he was a SA with HSI in a sworn law enforcement position, and
NGUYEN replied he was.  Rojas stated there are documents and
recordings of NGUYEN's interactions with the investigator.

   h.   Rojas located a video of NGUYEN on YouTube in
which NGUYEN stated he was an HSI SA and has been for 11 years.
Rojas gave me the link to the video
(https://www.youtube.com/watch?v=xPDEQeYLbA0).  I have watched
this video and it purports to be an interview of NGUYEN as an
HSI agent.  Among other things, NGUYEN stated he is an HSI SA
and that he has served under two administrations, President
Obama and President Trump.  He is interviewed about HSI and
immigration policies.

   25.   After the interview with Rojas, Rojas gave me screen
shots of text messages NGUYEN sent discussing NGUYEN's job with

HSI.  On one occasion, NGUYEN implied that he was executing a warrant when he sent Rojas a photo of different law enforcement officers entering a home with the messages, "Alphabet Soup! Child prostitution raid."  NGUYEN sent another message to Rojas during a conversation about the recent period of civil unrest across the country (in which DHS agents have played a prominent and controversial role), claiming, "we got orders to shoot freely just now."

> b.    *Danny Mayer, VMS Supervisor*

26.  On August 5, 2020, I interviewed Danny Mayer at the HSI Santa Ana office. The interview was audio recorded. Following the interview, Mayer provided a sworn, written affidavit that I witnessed with OPR SSA Guppenberger.  During the interview, I learned the following:

a.    Mayer is a Supervisor 1 at VMS, and he began working for VMS after he retired as a Deputy with the Orange County Sheriff's Department.

b.    NGUYEN began working at VMS about two years ago. NGUYEN was hired with the title Supervisor 1 so VMS could match NGUYEN's requested pay.  NGUYEN was not hired to supervise patrol officers, though; rather, NGUYEN was hired to supervise the office administration such as scheduling.

c.    NGUYEN told Mayer on multiple occasions that NGUYEN works for Homeland Security and that he was a Captain. Mayer also heard from many other VMS employees that NGUYEN worked for Homeland Security.  Mayer also saw a plaque in

NGUYEN's office (SUBJECT PREMISES 3) that said "Homeland Security" on it.

d.    Mayer saw NGUYEN with a gun and badge on his hip on several occasions.  Mayer indicated this made him uncomfortable because VMS is an unarmed location and VMS does not authorize its employees to carry guns.

e.    Mayer described an occasion in which NGUYEN approached him from behind and started to grab his waist and pat him down from behind.  NGUYEN continued to pat him down and said, "I'm searching you for weapons."  Mayer told NGUYEN not to touch him.  Mayer stated NGUYEN was wearing tan pants and a dark polo shirt at the time, which is not the specified uniform for the Laguna Woods Security staff.  Mayer stated that he did not believe VMS gave NGUYEN any authority to conduct pat downs or searches of any VMS employees.

c.    *Robert Martinez, VMS Supervisor*

27.  On August 5, 2020, I interviewed Robert Martinez at the HSI Santa Ana office. The interview was audio recorded. Following the interview, Martinez provided a sworn, written affidavit that I witnessed with OPR SSA Guppenberger.  During the interview, I learned the following:

a.    Martinez is a Supervisor 1 at VMS.  He began working for VMS after he retired as an Officer with the City of Orange Police Department.

b.    NGUYEN told Martinez that NGUYEN works for Homeland Security.  NGUYEN stated that he supervised 40 people at his Homeland Security job.

c.    Martinez saw a badge in a credential-style holder on NGUYEN's desk on several occasions.  SSA Guppenberger showed Martinez his HSI badge, and Martinez said that it looked similar to the badge NGUYEN had.  Martinez said NGUYEN would often come to work wearing a black polo shirt with a Homeland Security badge on the front right breast.

d.    Martinez had seen NGUYEN in the VMS office wearing a badge and gun on his right hip.  Martinez also saw NGUYEN wearing tactical gear and a drop-down holster while working at VMS.  Martinez said VMS is an unarmed job site, but NGUYEN told Martinez that he wore a gun to work because he was a Homeland Security agent.  Martinez said NGUYEN would arrive to work wearing his "gear" and indicated he just finished work for Homeland Security.  Martinez said he would see the same "gear" in NGUYEN's VMS office (SUBJECT PREMISES 3).

e.    About two years ago, NGUYEN pulled Martinez over utilizing a black SUV with red and blue lights.  Martinez was leaving work when he saw red and blue lights in his rear-view mirror and heard a siren chirp.  Martinez thought he was being pulled over by police, so he stopped his vehicle on the side of the road, at which point NGUYEN pulled up next to him in the black SUV and said, "Did I scare you, Martinez?"  NGUYEN then laughed and drove away.

f.    Martinez described an incident from about two and a half years ago in which NGUYEN patted Martinez down.  Martinez was exiting the radio room when NGUYEN approached him, stopped him, and patted down both of Martinez's legs.  Martinez said,

22

"Whoa what's going on," and NGUYEN replied, "Just checking." Martinez said NGUYEN has no authority to conduct pat downs or searches of any VMS employees.

> d.   *Rick Yates, VMS Supervisor*

28.   On August 5, 2020, I interviewed Rick Yates at the HSI Santa Ana office.  The interview was audio recorded.  Following the interview, Yates provided a sworn, written affidavit that I witnessed with OPR SSA Guppenberger.  In the interview, I learned the following:

a.   Yates is a Supervisor 1 at VMS.  He began working for VMS after he retired from a career as an Officer with Santa Ana School Police, Brea Police Department, and Fountain Valley Police Department.

b.   NGUYEN told Yates that he worked for Homeland Security and held the position of Captain.  NGUYEN had specifically said he was a sworn federal law enforcement officer.  NGUYEN would often make statements about "kicking in doors," indicating he had been executing search warrants.  Yates stated it was common belief by VMS employees that NGUYEN was a Special Agent with Homeland Security.

c.   Yates was in NGUYEN's office (SUBJECT PREMISES 3) one time and saw a badge on NGUYEN's desk.  Yates asked NGUYEN if that was his badge, and NGUYEN responded that it was before immediately putting the badge away.

d.   NGUYEN would often wear a gun in a thigh holster to work.  Yates also saw NGUYEN wearing tactical gear around the VMS office on numerous occasions, including items that bore a

23

"DHS" patch. Yates also saw NGUYEN wearing a badge next to a gun on his hip. Yates stated NGUYEN wearing a gun to work was upsetting because VMS was an unarmed location. Yates stated NGUYEN would make statements that he could wear a gun to work because he was a Homeland Security Special Agent.

e.  Yates described two occasions in which NGUYEN patted him down. On one occasion, he was in NGUYEN's office and NGUYEN began to pat him down asking, "Where is it at, Yates? Where is it at?" Yates believed NGUYEN was searching him for a concealed weapon. Yates stated the same thing happened approximately two weeks later. Yates stated that because he believed NGUYEN was a Homeland Security Special Agent, NGUYEN was patting him down under the color of his authority with Homeland Security. Yates stated NGUYEN had no authority through VMS to conduct pat downs or searches of VMS employees.

f.  Yates recalled an incident about two years ago at Laguna Woods Village in which a resident made threats and was believed to have a gun. Yates said NGUYEN "geared up" in his tactical gear, including a tactical vest and gun in a thigh holster. NGUYEN then proceeded to respond to the location of the threat even though he had no authority through VMS to take such action.

   *e.    Tom Siviglia, VMS Operations Manager*

29.  On August 5, 2020, I interviewed Tom Siviglia at the HSI Santa Ana office. The interview was audio recorded. Following the interview, Siviglia provided a sworn, written

affidavit that I witnessed with OPR SSA Guppenberger.  During
the interview, I learned the following:

       a.   Siviglia is the Operations Manager at VMS.  He
began working for VMS after he retired as an Officer with the
Cypress Police Department.

       b.   NGUYEN told Siviglia multiple times that NGUYEN
worked for DHS.  NGUYEN would often make statements about
organizing raids and search warrants, conducting applicant
interviews, and working immigration related matters.  NGUYEN
told Siviglia that NGUYEN was a GS-12 or 14 and allowed to make
his own schedule.  Siviglia saw a plaque in NGUYEN's VMS office
(SUBJECT PREMISES 3) that says, "Captain Donovan Nguyen Homeland
Security."  Siviglia gave me a photograph of the plaque, and I
saw that he had described it accurately.  NGUYEN brought in HSI
shirts for VMS employees and indicated he received an
"allowance" from Homeland Security to purchase the items.

       c.   Siviglia saw NGUYEN at work carrying a side arm,
wearing a tactical vest, and a badge on his hip or on the vest
itself.  Siviglia indicated NGUYEN's vest displayed a badge-type
patch that said "Special Agent" and appeared similar to a badge
he had seen in NGUYEN's wallet.  I showed Siviglia my HSI badge,
and Siviglia said it looked similar to the badge NGUYEN had.
Siviglia said he had seen NGUYEN's wallet badge approximately
two or three times.  Siviglia also said he had seen NGUYEN many
times at VMS wearing a polo shirt with an HSI badge on it.

       d.   NGUYEN repeatedly spoke about being a Homeland
Security Agent, and Siviglia believed NGUYEN simply because of

the things NGUYEN said, the items NGUYEN wore, and the badge
NGUYEN showed him.  NGUYEN sent Siviglia numerous text messages
and photos that would lead him to believe that NGUYEN was a
Homeland Security agent.  Siviglia said that this belief was
widely held by most VMS employees.

      e.  Siviglia saw red and blue lights in NGUYEN's
personal vehicle (a grey Toyota Tacoma, the SUBJECT VEHICLE) and
recorded video of the lights and sirens being activated.
Siviglia gave me a copy of that video during the interview.
Siviglia said NGUYEN went to a company called S&S Communications
to install the lights and sirens in his vehicle.  S&S
Communications is the same company VMS uses to install lights
and sirens in their company cars.  NGUYEN told Siviglia he
needed the lights and sirens in his personal vehicle because he
used it for work with Homeland Security.  NGUYEN asked Siviglia
if S&S would give NGUYEN a discount since NGUYEN worked for VMS.
Siviglia saw NGUYEN's invoice from S&S and believed NGUYEN
received a discount for being an HSI agent (not for being a VMS
employee) because the invoice said "Donavan Nguyen Homeland
Security."  Siviglia further recalled a representative from S&S
telling Siviglia that he gave NGUYEN "a deal."  The S&S
representative told Siviglia that he found it strange that
NGUYEN paid all cash and did not ask for a payment receipt since
the installation was being done for work relating to Homeland
Security (which would normally allow for reimbursement, and an
invoice typically would not suffice for reimbursement).

f.    Siviglia stated NGUYEN's position is salaried and certain work hours are required.  NGUYEN would often arrive to work late or leave early, stating he was working for DHS doing his "agent" duties.  NGUYEN would typically be fully "tacted out," wearing tactical gear on these occasions.  Siviglia said it seemed that NGUYEN would use his stated position with Homeland Security to skip working certain hours with VMS. Siviglia stated he believed NGUYEN would have never been hired by VMS if VMS knew NGUYEN didn't work for Homeland Security.

30.  Siviglia gave me an email sent by NGUYEN on August 20, 2018, from Donovan.Nguyen@dhs.gov.  The signature block showed the following: Donovan Nguyen, Director of JTF, DHS/ICE/Homeland Security Investigations, 34 Civic Center, Santa Ana, CA, Donovan.Nguyen@dhs.gov, 951-567-1926.[7]

2.    NGUYEN participated in executing a federal warrant with DSS while working at VMS

a.    *DSS SA Nico Figueroa*

31.  On July 28, 2020, I interviewed DSS SA Nico Figueroa via telephone.  During the interview, I learned the following:

a.    SA Figueroa was the case agent on a federal case in which DSS executed a search/arrest warrant at Laguna Woods Village on May 28, 2019.

---

[7] NGUYEN received a DHS email address from his time with Paragon Systems.  Smith said that NGUYEN received an @dhs.gov email address because he was the only guard at Paragon Systems who had completed a CBP background investigation.  Though Smith told me that NGUYEN no longer worked for Paragon Systems at AMOC, and he was in fact barred from AMOC, as of 2015, OPM databases showed that he was a contractor with Paragon Systems until September 2018.  I am still waiting to receive NGUYEN's full records from Paragon Systems and OPM.

b.   Days prior to executing the warrant, SA Figueroa met NGUYEN at the VMS facility and NGUYEN introduced himself as a security supervisor for the retirement community as well as an HSI agent assigned to the Santa Ana office.

c.   The morning of the warrant execution, SA Figueroa saw NGUYEN wearing tactical raid gear, a thigh holster with a weapon and ballistic vest displaying an HSI badge.  NGUYEN claimed he was part of the Joint Terrorism Task Force and worked all night prior to the search warrant, but he still wanted to show up to help execute the warrant at Laguna Woods Village.

d.   SA Figueroa stated that DSS allowed NGUYEN to participate in executing the warrant only because DSS agents believed NGUYEN was an HSI SA.  Among other things, NGUYEN was the first person to open the door to the premises being searched before DSS SAs entered.  SA Figueroa confirmed, and I know from my own experience as an HSI SA, that an SA would only allow another sworn law enforcement officer to carry out such a duty. Agents would never allow an employee of a private security company, even if the company worked security at the facility being searched, to participate in executing a warrant in that manner.

b.   *DSS SA Luis Orozco*

32.  On July 28, 2020, I interviewed DSS SA Luis Orozco via telephone.  During the interview, I learned the following:

a.   SA Orozco recalled executing a DSS search/arrest warrant at Laguna Woods Village in the spring of 2019.

b.   SA Orozco met NGUYEN on the morning of the warrant, and NGUYEN distinctly stood out because NGUYEN introduced himself as an HSI SA (the only non-DSS SA executing the warrant).  SA Orozco recalled NGUYEN wearing "tactical" HSI enforcement gear to include a drop-down type thigh holster with a weapon, and a tan tactical ballistic vest with an HSI badge on the front.

### E.   Identification of SUBJECT PREMISES 1 & 2

33.  California DMV records show that NGUYEN listed the SUBJECT PREMISES 1 as his address on the vehicle registration for a 2018 Audi, which is registered in his and his wife's name.

34.  On July 9, 2020, other law enforcement agents and I conducted surveillance at SUBJECT PREMISES 1.  A white Audi SUV registered to NGUYEN was parked in the driveway.  Also parked in the driveway was the SUBJECT VEHICLE, registered to NGUYEN at SUBJECT PREMISES 1.  From reviewing the video provided by Siviglia and referenced above, I believe this is the same truck outfitted with red and blue emergency lights and sirens that NGUYEN used to conduct a "traffic stop" at Laguna Woods Village. We saw a man whom I believed to be NGUYEN, based on physical resemblance, leave and reenter SUBJECT PREMISES 1 throughout the day.

35.  Additional California Department of Justice record checks revealed NGUYEN had at least 42 firearms registered to him with the address listed as SUBJECT PREMISES 2.

36.  A record check with the California Department of Consumer Protection, Bureau of Security and Investigative

Services, revealed that NGUYEN has a current exposed firearm permit and a baton permit with the address listed as SUBJECT PREMISES 2.  Additionally, Vigilantz's entity address listed with the California Secretary of State is SUBJECT PREMISES 2.

## V.    TRAINING AND EXPERIENCE ON FEDERAL EMPLOYEE IMPERSONATION INVESTIGATIONS

37.  Based on my training on impersonation cases and my discussions with other law enforcement about impersonation cases, I am aware that individuals who have falsely represented themselves to be federal employees or law enforcement officers often use items to convince others of their legitimacy as a federal employee or law enforcement officer.  These items include counterfeit identification documents, apparel with law enforcement markings, law enforcement tactical gear, weapons, and red and blue colored lights.  Individuals involved in impersonating federal employees often create their own fraudulent identity documents and other items purporting to be from a federal agency.  It is common practice for such individuals to use digital devices to alter existing identification documents or law enforcement materials, or to create fraudulent identification documents or law enforcement materials.  They also may use their digital devices to research the appearance of authentic identification documents or law enforcement materials.  It is common for individuals who impersonate federal employees to keep this information on their digital device for a long time.

38.  Often, individuals who impersonate federal employees take photographs of the fraudulent identification or agency related items they have produced, or other items associated with the impersonation.  They also take photographs of benefits they have received from impersonating a federal employee, such as people they have impressed and money or other valuable items, including drugs, gift cards, or vehicles.

39.  Individuals impersonating federal employees on social media often do so on multiple platforms (Facebook, Instagram, LinkedIn, etc.) and also in their electronic communications such as e-mail, text messages, WhatsApp, and Snapchat.  Evidence of social media and electronic communication related to impersonating a federal employee would be found on digital devices.

### VI.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

40.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy

31

disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices. Based on my knowledge, training, and
experience, as well as information related to me by agents and
others involved in the forensic examination of digital devices,
I know that data in digital form can be stored on a variety of
digital devices and that during the search of a premises it is
not always possible to search digital devices for digital data
for a number of reasons, including the following:

a.    Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment. There are so many types of digital
devices and software programs in use today that it is impossible
to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a
thorough search. In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

b.    Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data. As a result,
a controlled environment, such as a law enforcement laboratory

or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500-gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[8] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive

---

[8] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

          e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital

34

devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

       f.  Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was

35

not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment and can require substantial
time.

       g.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort

through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

41.    As discussed herein, based on my training and experience I believe that digital devices will be found during the search.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

42.    Users may enable a biometric unlock function on some digital devices.   To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.   To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.   To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

43.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.   Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

44.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress NGUYEN's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of NGUYEN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

45.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VII. <u>CONCLUSION</u>

46.   For all the reasons described above, there is probable cause to believe that NGUYEN has committed a violation of 18 U.S.C. § 912 (False Impersonation of a Federal Officer or Employee).

47.   Further, there is probable cause to believe the items listed in Attachment B are evidence, fruits, and instrumentalities of the offenses described in Attachment B and that those items will be found at the places to be searched, as described in Attachments A-1 through A-5.

/s/ signed pursuant to
Fed. R. Crim. P. 4.1

_____
Alnahl Jones,
Special Agent
Homeland Security
Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>19th</u> day of August, 2020.

_____
UNITED STATES MAGISTRATE JUDGE